CONTINENTAL CASUALTY CO., Plaintiff,

v.

Doreen ALLEN, et al., Defendants.

CONTINENTAL CASUALTY CO., Plaintiff,

v.

MOORE–HARALSON AGENCY, P.C., et al., Defendants.

Civ. A. Nos. CA–5–86–252–C, CA–5–87–156–C.

United States District Court, N.D. Texas, Lubbock Division.

April 3, 1989.

Dennis R. Yeager and Richard Imbrogno of Yeager & Lang, New York City, and Alton Griffin, Lubbock, Tex., for plaintiff.

Pete Baker of Glandon, Erwin, Scarborough, Baker & Choate, Abilene, Tex., Tom M. Richards of Smith, Merrifield & Richards, Dallas, Tex., Frank E. Murchison and H. Alan Carmichael of McCleskey, Harriger, Brazill & Graf, Robert L. Craig, Jr. of Carr, Evans, Fouts & Hunt, Tom S. Milam of Crenshaw, Dupree & Milam, John C. Sims and Richard Hubbert of Sims, Kidd, Hubbert & Wilson, Lubbock, Tex., T. Ray Guy and John C. Eichman of Jenkens, Hutcheson & Gilchrist, Dallas, Tex., Michael H. Carper, J.R. Blumrosen and Myrtle McDonald of Blumrosen & McDonald, Lubbock, Tex., and Floyd D. Holder, Jr., Lubbock, Tex., for defendants.

George Shivers, Irving, Tex., pro se.

## MEMORANDUM OPINION IN SUPPORT OF PARTIAL JUDGMENT

CUMMINGS, District Judge.

The first stage of a bifurcated jury trial was held in this matter regarding declaratory judgment issues of the plaintiff's liability to the defendants on certain directors' and officers' liability insurance policies. The Court also entertained evidence in the non-jury trial, consolidated with the jury trial, regarding indemnification rights of the plaintiff against the defendants' insurance agent. The trial spanned approximately two weeks and culminated in a jury verdict on some 28 special issues. The Court, after considering the arguments of counsel, hearing the testimony, and reviewing the exhibits admitted in evidence and jury verdict, files this memorandum opinion in support of the partial judgment entered this same date.

### Factual Background and Findings

Most of the defendants in this action were officers or directors of the failed Seminole State National Bank ("the Bank"). The plaintiff became involved with the Bank in 1983 through the assumption of certain obligations and rights of an insurance company entitled MGIC Indemnity Corporation ("MGIC"). MGIC aggressively solicited and created a large portfolio of

directors' and officers' liability insurance ("D & O insurance") including that for the Bank. The defendants began placing their D & O insurance with MGIC in 1977. The policy issued by MGIC in 1977 was renewed upon the same terms and conditions in 1980, Policy No. DO5618-6, for another three years ("the 1980 Policy").

In early August, 1983, the defendants submitted an application requesting renewal of the 1980 Policy. Shortly after submitting their application for insurance, the defendants were notified that the Office of the Comptroller of the Currency was issuing a temporary cease and desist order against the Bank. The directors did not tell MGIC about the issuance of the cease and desist order. However, the defendants subsequently received from MGIC an insurance binder which greatly varied from the terms of the two prior policies.

In this same time period, the plaintiff became involved in buying the book of business of MGIC's portfolio of directors' and officers' liability policies. The plaintiff entered into several agreements with MGIC, including an Assumption Reinsurance Agreement dated November 18, 1983 ("Assumption Agreement"); Claim Service Agreement dated November 18, 1983; an Agreement Not to Compete dated November 1, 1983; a Sales Service Agreement dated November 18, 1983; and an Underwriting and Administration Agreement dated November 18, 1983. Although dated and apparently executed in November, some of these agreements were effective as early as October 1, 1983.

A new, one-year policy for D & O insurance, Policy No. 04175–DA01, was issued by MGIC to the Bank in December, 1983 with an effective date of October 27, 1983 (the "1983 Policy"). The 1983 Policy contained an assumption endorsement executed by the plaintiff whereby it assumed all of MGIC's obligations under the 1983 Policy. In March, 1984, the Federal Deposit Insurance Corporation ("FDIC") closed the Bank and subsequently filed suit against many of the directors.[1] This FDIC suit, among others, triggered the plaintiff to file a declaratory judgment action regarding its liability on the 1983 Policy.

The parties do not dispute that the defendants are among the defined "insureds" under both the 1980 Policy and the 1983 Policy. The Court's attention in this portion of the case is narrowly drawn to the liability provisions of the policies and the parties' actions preceding the issuance of the 1983 Policy to determine the parties' rights.[2] Many legal issues complicate this case due to the plaintiff's agreements with MGIC and the fact that the crucial time frame for renewing the 1980 Policy was coincidentally the same time frame as all the agreements between the plaintiff and MGIC.

The plaintiff admits in its brief and through testimony of witnesses that the 1983 Policy contains significantly different terms.[3] On or about October 17, 1983, Mr. Richard Carpenter, an MGIC employee, held a telephone conference with the defendants' insurance agent, Carroll Haralson of the Moore–Haralson Agency, P.C., regarding the different terms, conditions, and endorsements in the 1983 Policy. Mr. Carpenter subsequently followed up such conversation with a written letter. Additionally, various memoranda were introduced by the parties regarding MGIC's plans to reduce its potential liability in D & O insur-

1. For example, one such suit, *FDIC v. Spikes, et al.*, No. CA 5–87–043–C, is still pending in this Court.

2. The defendants counterclaimed against the plaintiff for a bad faith breach of insurance contract. The Court severed this portion of the case by its order of September 14, 1988.

3. For example, the 1983 Policy only covers one year instead of three and limits any extension of coverage thereunder to 90 days instead of twelve months. The limit of liability was de-

creased from $2 million dollars to $1 million and the deductible (or "retention") was increased from $5000 to $20,000. Further, the one-year premium was *more* than half of the prior *three*-year premium. Several new endorsements were included, among them being the "FDIC" endorsement and the "insured versus insured" endorsement, both of which are discussed *infra,* and an uninsured depositor endorsement and IRA/Keogh endorsement. All such endorsements attempt to further restrict coverage.

ance by inserting significantly different terms and conditions in policies when renewal was sought.

■ The Bank was a bank doing business in Texas when it contracted with MGIC for insurance. Therefore, the Court applies Texas law throughout this opinion even though certain agreements between the plaintiff and MGIC may be more properly construed using Illinois law [the plaintiff's principal place of business] or Wisconsin law [situs of MGIC's receivership and prior principal place of business of MGIC]. None of the parties have raised any conflict of laws questions, but in fact advised the Court on certain points in post-trial briefs that same results occur under Illinois and Wisconsin law as under Texas law. Therefore, the Court proceeds under Texas law, without any conflict of laws questions and with the assumption that the other two states involved would reach similar results.

### Partial Jury Verdict

The jury, after deliberating several days, failed to answer Questions 4A, 4B, and 4C. Further, Questions 10, 16 and 17 were withdrawn from the jury after several notes from the jury indicated a lack of understanding of the legal terms therein.[4] The plaintiff contends that it is entitled to a mistrial since the answers to Questions 4A, 4B and 4C are ultimate issues. The Court, however, disagrees.

Questions 4A, 4B, and 4C ask whether any events occurred prior to October 27, 1983 (the expiration date of the 1980 Policy and effective date of the 1983 Policy) which are material enough to render the insurance proposal form inaccurate and if notice of such an event was given to the plaintiff or if the defendants knew such an event was not communicated to the plaintiff. The primary basis for these questions is the plaintiff's contention that the issuance of the temporary cease and desist order in September, 1983, was a material omission which affected its risk of insurance and the defendants should have amended their application for insurance once the cease and desist order was issued.

■ The Court finds that the answers to Questions 4A, 4B, and 4C are not ultimate issues. Additional elements of (i) the defendants' intent to deceive and (ii) the plaintiff's reliance are necessary in order to void the 1983 Policy for fraud or material misrepresentation. *Mayes v. Massachusetts Mut. Life Ins. Co.*, 608 S.W.2d 612, 616 (Tex.1980); *Republic–Vanguard Life Ins. Co. v. Walters*, 728 S.W.2d 415, 418 (Tex. App.—Houston [1st Dist.] 1987, no writ).

The jury answered Question No. 1 in the negative regarding whether the defendants made a material, false representation or omission. This answer precluded the jury from answering subsequent Questions 2 and 3 which asked about the defendants' intent to deceive or the plaintiff's reliance. Additionally, although the jury did not follow the limiting instructions, the jury answered Questions 4D and 4E, which specifically asked about the plaintiff's reliance and the defendants' intent to deceive. The jury answered both Questions 4D and 4E in the negative.

■ The Court finds the answers to Questions 1, 4D and 4E supported by the evidence, thereby precluding the plaintiff from succeeding on theories of fraud or material misrepresentation. *Bridges v.*

---

**4.** The jury's numerous notes and the Court's responses are filed as part of the record in this case. In each instance, the parties' counsel were consulted before responding to the inquiries. The parties consented to the Court withdrawing Questions 10, 16 and 17 from the jury's consideration. Further, the Court gave a modified *Allen* charge to the jury upon being noticed of the jury's deadlock over Questions 4A, 4B and 4C.

A large portion of the jury's verdict, as discussed herein, is considered by this Court as only advisory. The Court advised the parties of the jury's status in this regard prior to submitting the special issues since many of the requested issues involved purely legal issues or equitable theories and were not subject to determination by the jury. For example, the defendants repeatedly requested special issues on the legal and equitable theories of contractual interpretation, waiver, estoppel, reformation and rescission. Such are within the Court's providence, not the jury's. Thus the lack of a jury answer to Questions 10, 16 and 17 is not defective to the Court's authority to determine such and fashion a judgment.

*Chemrex Specialty Coatings, Inc.,* 704 F.2d 175, 180 (5th Cir.1983) (adopting the 8th Circuit's decision in *Skyway Aviation Corp. v. Minneapolis, N & S Ry. Co.,* 326 F.2d 701 (1964) in determining whether unanswered jury questions leave a "gaping hole" in a verdict). Even if the jury had answered Questions 4A, 4B, and 4C favorable to the plaintiff, the ultimate issue and ability to succeed on the plaintiff's theory requires favorable answers to *at least* Questions 4D and 4E, which is lacking in the verdict. The Court does not dispute that Questions 4A, 4B and 4C are factual findings, but the lack of a jury answer is not fatal to a judgment since the other elements of the plaintiff's cause of action were answered negatively.

Therefore the jury verdict can be fashioned into a declaratory judgment that the defendants made no misrepresentations which would void the 1983 Policy. The 1983 Policy is in effect as providing D & O insurance coverage of the defendants per its terms and conditions as interpreted herein. The plaintiff's assumption endorsement attached to the 1983 Policy makes the plaintiff liable on the 1983 Policy, subject to the further findings and conclusions discussed hereinbelow.

### *Coverage under 1980 Policy*

█ Defendants contend that notice to their insurance agent should be effective notice to the plaintiff (or more properly MGIC) of an occurrence that could result in a claim under the 1980 Policy.[5] The 1980 Policy, as well as the 1983 Policy, is a *claims made* policy, so that liability is triggered only if a claim is made during the time frame of the policy. If notice to the insurance agent of the cease and desist order or other problems of the Bank was proper notice of a possible claim, the defendants would be entitled to $2 million insurance coverage under the 1980 Policy.

However, Carroll Haralson not only acted as the insurance agent but was also an insured under both policies in question by virtue of his serving as a director for the Bank. Thus any knowledge that he had is *not* imputed to either the plaintiff or MGIC. See *Southern Farm Bureau Casualty Ins. Co. v. Allen,* 388 F.2d 126, 131 (5th Cir.1967) (principal is not affected by notice to an agent who acts adversely to the interest of his principal and for his own benefit or the benefit of a third party); *Arabesque Studios, Inc. v. Academy of Fine Arts Int'l, Inc.,* 529 S.W.2d 564, 568 (Tex.Civ.App.—Dallas 1975, no writ) (knowledge of agent not imputed to principal if agent had personal adverse interest in not revealing the knowledge); and 16 J. Appleman, *Insurance Law and Practice,* § 8737 at 425 (1981).

Therefore, the insurance agent in this case must have affirmatively communicated any knowledge he had to MGIC or the

---

5. The plaintiff contends that the evidence supports findings that Haralson and/or the Moore–Haralson Agency, P.C. knew *prior* to October 27, 1983 that:

(i) the Bank had concentrations of credit which warranted reduction or correction;

(ii) the Bank had extensions of credit which exceeded the legal lending limit;

(iii) the Bank had assets subject to criticism which exceeded 25% of capital;

(iv) the Bank had problems involving extensions of credit to its directors, officers and corporations controlled by the same;

(v) a temporary cease and desist order was issued against the Bank on September 9, 1983, regarding certain violations of law and unsafe/unsound banking practices and requiring a capital injection as well as the cessation of certain lending practices;

(vi) the Bank was undergoing a concurrent examination with three other banks controlled by Sam Spikes;

(vii) the examiner-in-charge of the examination stated he was recommending civil money penalties against all past and present directors; and

(viii) other acts, errors or omissions had occurred that could lead to a claim under the 1980 Policy.

The Court, however, finds these issues are issues of fact which were not submitted to the jury for determination in this case. However, since the non-jury trial of a related indemnity case between the plaintiff and the insurance agent (Civil Action Number CA 5–87–156–C) was consolidated for trial with this case, the Court will review such findings pursuant to its order, filed this same date, calling for further briefing in that case.

If the defendants seek damages from the insurance agent and need such findings to establish liability on the insurance agent's part, they must do so in a separate suit as such issues were not raised in the case at bar.

plaintiff in order to clothe the defendants with coverage under the 1980 Policy. Haralson's failure to so advise the plaintiff or MGIC prohibits a finding of liability under the 1980 Policy.[6] Except as discussed further herein, the 1980 Policy lapsed without any claim made for all practical purposes.

### Non-renewal of the 1980 Policy

The importance of whether the 1983 Policy was a renewal of the 1980 Policy arises from the 1980 Policy requirement that the insurance company give notice to the Bank upon cancellation or *non-renewal* of the 1980 Policy.[7] The defendants argue that issuance of the 1983 Policy on substantially different terms than the 1980 Policy is a non-renewal and should entitle them to reformation/rescission of the 1983 Policy or at least to a 12–month extension for making claims under the "discovery option" of Paragraph 2(b) of the 1980 Policy.[8]

■ The Court finds that as a matter of law the 1983 Policy is a completely different policy and is a non-renewal of the 1980 Policy. Renewals must be upon the same terms and conditions as a prior policy. *Edwards v. Goode*, 228 F. 664 (5th Cir.1916); *Liverpool & London Globe Ins. Co. v. Swann*, 382 S.W.2d 521, 522 (Tex.Civ.App. —Beaumont 1964, no writ); *Springfield*

*Fire and Marine Ins. Co. v. Hubbs–Johnson M. Co.*, 42 S.W.2d 248, 252 (Tex.Com. App.1931); and *Kemmerer Eng'g Co. v. Continental Casualty Co.*, 253 Cal.App.2d 188, 61 Cal.Rptr. 94 (1967).[9] Such a finding agrees with the jury's answer to Question 12 regarding the insurance company's failure to renew the 1980 Policy.

■ Plaintiff argues strenuously that a renewal can contain different terms if an agreement incorporating such different terms exists. *See e.g., Liverpool & London Globe Ins. Co. v. Swann*, 382 S.W.2d 521 (Tex.Civ.App.—Beaumont 1964, no writ). However, the Court fails to find any *agreement* between the parties to change the terms of the contract. Notice to the defendants' insurance agent of the new policy being offered on a take-it-or-leave-it basis is not sufficient to comprise an *agreement with the Bank* to renew on different terms. An agreement requires the mutual assent of both parties. *Three–Seventy Leasing Corp. v. Ampex Corp.*, 528 F.2d 993, 996 (5th Cir.1976). The defendants' lack of agreement is evidenced in their repeated characterization of the 1983 Policy as an attempt by MGIC to "hoodwink" the defendants into believing that the discovery option was not available under the 1980 Policy.

**6.** As discussed *infra,* who holds liability for claims under the 1980 Policy is unresolved due to the contracts between the plaintiff and MGIC and the failure to join MGIC's liquidator as a party to this action.

**7.** Paragraph 7 of the 1980 Policy, entitled "General Conditions," contains the following language in the fourth paragraph under subparagraph (b):

If the Insurer *elects not to renew* this policy, the Insurer shall provide the Bank for itself and as agent for the Directors and Officers with *no less than thirty (30) days advance notice thereof.* If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by law [emphasis added].

**8.** The 1980 Policy provides in Paragraph 2(b) that

if the Insurer shall cancel or *refuse to renew this policy,* the Bank has the right ... to an extension of coverage of the coverage granted

by this policy with respect to any claim or claims which shall be made against the Directors or Officers during the period of twelve calendar months after the date of such cancellation or refusal to renew ... [emphasis added].

Such extension, however, applies only to wrongful acts committed before the date of such cancellation or non-renewal and must be requested within ten (10) days after the effective date of cancellation or non-renewal of the policy.

**9.** The defendants cite many cases from other states involving the necessity of substituting a new obligation on the *same terms and conditions* as the old policy in order to be a "renewal". The Court takes note of these cases but does not feel the need to adopt them due to existing law in this circuit and in Texas. Reference is made to *Couch on Insurance 2nd* § 968.2 (rev. ed. 1983), which states the proposition that a "renewal" is the original policy being recreated in substance by a subsequent policy.

Thus in the case at bar, only a unilateral changing of the terms exists.[10] A separate and independent insurance contract exists, known to us as the 1983 Policy. Simply reasoning through the different terms and the lack of agreement to "renew" on different terms dictates that the 1983 Policy does not qualify as a renewal of the 1980 Policy.

Both sides argue theories of estoppel and waiver regarding the "renewal" of the 1980 Policy. The Court, as did the jury, finds that these theories are not controlling for either party. Rather the 1983 Policy is a separate policy of insurance due simply to the non-renewal by MGIC of the 1980 Policy.

### Reformation/Rescission

■ Defendants contend that they are entitled to rescission or reformation of the 1983 Policy to conform with the terms of the 1980 Policy. The defendants base their argument on the jury's answers to Questions 19 and 21–28 regarding reformation, fraud and deceptive trade practices. However, as the Court noted before submitting the requested issues, the jury's answers are only advisory where issues of law (as opposed to fact) or equity are involved. Therefore the Court's providence includes the ability to disregard these answers, which, as a matter of law, the Court finds it must do.

■ Because the Court finds that the 1983 Policy is a separate and new insurance contract, and not a renewal of the 1980 Policy, the Court must have evidence of mutual mistake, fraud or material misrepresentation in order to reform or rescind the 1983 Policy. The plaintiff properly points the Court to the facts that both parties are sophisticated businessmen dealing at arms length who had access to the facts underlying the transaction. True, MGIC offered the 1983 Policy in an effort to reduce its potential liability and offered it on a take-it-or-leave-it basis, but such is not enough to conclude that MGIC acted in some way that subjects the plaintiff to reformation or rescission. No mutual mistake was proven by the defendants.

■ Regarding fraud and material misrepresentation, a distinction must be drawn between the plaintiff and MGIC. The Assumption Agreement between these two entities expressly excludes tort liability, punitives and extra-contractual liability of MGIC.[11] Similarly, several of the other contracts between these companies contain parallel language.[12] Such comports with Texas law that a company is liable *only* for those obligations it expressly assumes. *See* Tex.Bus.Corp.Act Ann. art. 5.10(B)(2) (Vernon Supp.1989); *Suarez v. Sherman Gin Co.*, 697 S.W.2d 17, 20 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Therefore, the Court finds that any tort liability of MGIC for fraud or deceptive trade practices in issuing the 1983 Policy *cannot* be imputed to the plaintiff.

To the extent that the jury's answer to Question 20 might encompass the plaintiff assuming any tort or extra-contractual liability, such a finding is disregarded.[13] To the extent that Questions 21–28 are based

---

10. The defendants accepted the new policy by paying the premium. However, nothing can be implied from their acceptance of a *new* policy that they waived any and all rights under an old policy. Waiver as discussed *infra* requires a voluntary relinquishment of a known right. Evidence of MGIC's attempt to limit the defendants' right to discovery coverage under the old policy destroys any "voluntariness" or "knowing" waiver by the defendants.

11. Article VII's third paragraph of such agreement states that MGIC

agrees that in respect to Claims in Existence as of the Effective Date of this Agreement, CNA [the plaintiff] will not be responsible for any extra-contractual damages in the form of punitive damages or damages in excess of policy limits resulting from the negligence or bad faith of the Company [MGIC], its employees or agents in the handling of claims and that the payment of such damages will remain the sole responsibility of the Company.

12. For example, Article I C and Article II C of the Claims Service Agreement provide that the plaintiff is liable only for extra-contractual damages arising from its acts or omissions and not for the acts of MGIC. Similarly, see the Sales Service Agreement, Paragraph 4, and the Underwriting and Administration Agreement, Article I, Paragraph I. All such agreements are part of the defendants' Trial Exhibit No. 9.

13. Question 20 reads:

Do you find that Continental [the plaintiff] assumed all the policy obligations of the in-

on MGIC's acts and not the plaintiff's own acts, the Court must disregard these jury findings.[14] Perhaps because the defendants proceeded throughout the trial on the theory that the plaintiff is liable for MGIC's tortious actions, no evidence is contained in the record which would support a finding that the plaintiff tortiously acted in its own regard.

Thus the Court cannot find that the plaintiff's own actions are grounds for reformation or rescission, contrary to the defendants' arguments and the jury findings. No separate jury finding exists as to the plaintiff's own tortious activities. Therefore, the 1983 Policy stands as written and interpreted by this Court. If the defendants were defrauded and damaged by the introduction of the 1983 Policy, their remedy is solely against the entity committing the acts. The only acts in the record are those of MGIC, *not* the plaintiff.[15]

Thus the defendants are not entitled to rescission or reformation under any of the numerous theories advanced.

surance policies in question from MGIC Indemnity Corporation?
Answer "Yes" or "No."
Answer: <u>Yes</u>
The plaintiff argues that this finding is limited to policy liability while the defendants argue that the finding is much broader and encompasses all liability.

14. All of the evidence of intentionally changing the 1980 Policy's terms in order to limit exposure involved acts of MGIC and its employees. Confusion in the parties' and jury's minds of these acts being the acts of the plaintiff may have stemmed from the definition of the plaintiff in the jury charge. The plaintiff was defined in the general instructions to include its "predecessor-in-interest, MGIC, or its parent company, CNA." This definition was used by the jury to answer all of the special issues.

No distinction was made or argued during the trial that the plaintiff is only limitedly a "successor-in-interest" of MGIC, which could have added to the confusion. The Court, however, is bound by the parties' contractual agreements which explicitly state that the plaintiff only limitedly assumed obligations and responsibilities of MGIC. Further, the plaintiff has never waived this position but instead consistently argued such throughout pre- and post-trial briefing.

15. The acts complained of at trial included the use of numerous endorsements restricting coverage while at the same time reducing the policy

## 1983 Policy Coverage and Regulatory Endorsements

*1983 Policy Coverage.* The jury found in Question 14 that the plaintiff had not breached its contract with the defendants under the 1983 Policy. Other jury findings regarding the 1983 Policy include that the defendants are not guilty of dishonest acts or personal profit (both of which are exclusions for coverage under the 1983 Policy) and that the plaintiff waived all other grounds for denying coverage that were not noted in its letter dated October 17, 1984 (presumably applying to any denial based on the unsecured credit exclusion). The Court notes that little or no evidence was presented by the plaintiff regarding its claims for these exclusions. The Court and jury's tasks, however, in this trial were to determine if coverage exists under the policies in question.

The jury findings in each of these instances were favorable to the defendants (Questions 5, 6 and 9). If the plaintiff is

amounts and increasing premiums and deductibles. Mr. Carpenter, an MGIC employee, introduced many business records of MGIC which indicated a pattern of reducing and cutting exposure in D & O insurance policies after MGIC had actively solicited the contracting bank's business. This pattern involved a two-step process: first, reducing coverage to a bare minimum for only a one-year term and then secondly, not renewing the bare minimum coverage policy. Since discovery options were cut to 90 days and the new policies were only one year in length, MGIC could effectively reduce its exposure in D & O insurance fairly quickly. This process was established even though MGIC's own in-house legal counsel was uncertain that such would be legal and enforceable in a court of law.

This Court finds that such activity was and is not enforceable under the scheme of "renewing" policies, but does not find any liability on the part of MGIC for such activity for two reasons. First, MGIC's liquidator is not a party to this action and MGIC's interests have not been defended. Secondly, the jury's instructions to consider MGIC as one and the same as the plaintiff may have been misleading and does not allow a finding as to MGIC's own actions. Any misleading character of the definition of the plaintiff, however, is not grounds for a mistrial since both parties agreed with the definition submitted and failed to object or propose other special issues regarding each entity's actions.

waiting the outcome of certain lawsuits against the officers and directors to determine if the Bank's failure was due to such persons' personal profit and/or dishonesty, the plaintiff may have missed its opportunity to preserve an exclusion argument at the later date. Since the plaintiff carried the burden of proof on these issues at trial, the jury findings regarding personal profit, dishonesty and waiver of other grounds for denial of coverage are upheld.

*Ambiguity.* Certain endorsements restricting coverage of the 1983 Policy are argued by the defendants and FDIC (an intervenor herein due to its interest in other lawsuits involving the Bank's failure) as being ambiguous and void as against public policy. This Court previously held by order dated February 16, 1988, that Endorsement 1 was ambiguous and that Endorsement 3 was unambiguous. Discussion was given concerning the reasonable expectations of the parties. Arguments were again raised at trial regarding the ambiguity of both endorsements in question, including submitting special issues on the parties' intent under each endorsement. Therefore, the Court takes this opportunity to review and reanalyze its February order, especially since a supporting case relied upon by the Court in such order has reversed its position.[16]

Endorsement 1 was sometimes called the "FDIC" or "regulatory" endorsement during trial and is entitled in the 1983 Policy as the "General Limitation of Coverage" endorsement. It retracts liability of D & O insurance coverage for claims made against the defendants for:

> any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, any other depository insurance organization, the Comptroller of the Currency, the Federal Home Loan Bank Board, or any other national or state regulatory agency (all of said organizations and agencies

hereinafter referred to as "Agencies"), including any type of legal action which such Agencies have the legal right to bring as receiver, conservator, liquidator or otherwise; whether such action or proceeding is brought in the name of such Agencies or by or on behalf of such Agencies in the name of any other entity or solely in the name of any Third Party.

Endorsement 3 is also claimed to be ambiguous and is captioned as the "Insured v. Insured" endorsement. Endorsement 3 states that:

> It is understood and agreed that the Insurer shall not be liable to make any payments for Loss, as defined in Clause 1(d) hereof, which is based upon or attributable to any claim made against any Director or Officer by any other Director or Officer or by the Institution defined in Clause 1(a) of the Policy (hereinafter called "Institution") except for a shareholder's derivative action brought by a shareholder of the Institution other than an Insured.

 Interpretation of insurance policies is a question of law for the Court. *Kelly Assoc., Ltd. v. Aetna Casualty & Sur. Co.*, 681 S.W.2d 593, 596 (Tex.1984). Ambiguity exists if two or more reasonable interpretations exist. *Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex.1977); *Mid–United Contractors, Inc. v. Providence Lloyd Ins. Co.*, 754 S.W.2d 824, 827 (Tex.App.—Ft. Worth 1988, writ denied). Therefore, whether a contract provision is ambiguous is a matter for the Court to determine.

The Court entertained evidence of the parties' intent at trial and submitted jury issues (Questions 7 and 8) regarding exclusion of coverage under both endorsements for the pending lawsuits. The contractual language of Endorsement 1 clearly excludes claims by FDIC and *is not* ambiguous. The Court therefore adopts the obvious, reasonable interpretation. *Westwind*

---

**16.** *See American Casualty Co. v. FDIC*, No. C86–4018 —— F.Supp. —— (N.D.Iowa Oct. 5, 1988) (order denying re-urged motion for summary judgment).

The parties to this case were advised during the trial of the Court's rethinking of its February order and told to present evidence accordingly. Thus, no prejudice results to either side by the Court's holding today.

*Exploration Inc. v. Homestate Savs. Ass'n,* 696 S.W.2d 378, 382 (Tex.1985). The Court's finding today comports with the jury's finding on Question 7 that the *FDIC v. Spikes* lawsuit was intended to be excluded from coverage and is supported by evidence such as the defendants' insurance agent knowing the meaning of such endorsement through his conversations and written communications with Mr. Carpenter. See also, *American Casualty Co. v. FSLIC,* 683 F.Supp. 1183 (S.D.Ohio 1988) (regulatory endorsement is clear and unambiguous); and *Mt. Hawley Co. v. FSLIC,* 695 F.Supp. 469 (C.D.Cal.1987) (dicta regarding FSLIC claims would have been barred if policy contained a regulatory endorsement).

■■■ However, Endorsement 3 *is* ambiguous as to who is "an insured." The contractual language of such endorsement, rules of construction and the evidence at trial, specifically including Mr. Carpenter's inability to understand the definition of "insured" and meaning of the endorsement, support a finding that FDIC is not an "insured" under such endorsement. *Standard Fire Ins. Co. v. Griggs,* 567 S.W.2d 60, 63 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.) (uncertainty of the meaning of a word creates ambiguity).

This Court therefore construes Endorsement 3 strictly against the insurance company and in a manner which allows coverage in accordance with *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344,

349 (Tex.1976). Such a finding rejects the jury answer to Question 8 since such a finding was not properly before the jury and is not supported by the evidence.[17] Endorsement 3 therefore would not exclude claims by the FDIC. *See accord, FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149, 1157 (W.D.La.1986).

If the 1983 Policy only contained the Insured v. Insured endorsement, all FDIC suits would appear to be covered, by virtue of FDIC not being within the definition of "insured." However, when the regulatory endorsement is added to the policy, FDIC's suits are excluded. Thus the plaintiff's liability under the 1983 Policy depends on the types of suits or liability the directors and officers of the Bank are facing.[18]

*Public Policy.* Turning now to the arguments regarding Endorsements 1 and 3 being void as against public policy, the Court recognizes the magnitude of its decision due to the apparent widespread use of such endorsements and the current banking situation in the Southwest area of the country.

■■■ For contractual provisions to be void for public policy reasons, they must be injurious of the public good or be subversive to sound morality. *Ritter v. Mutual Life Ins. Co.,* 169 U.S. 139, 154, 18 S.Ct. 300, 305, 42 L.Ed. 693 (1898). Thus, the most often found violators of public policy are contracts that induce criminal conduct or are contrary to statutory law. *Northwestern Mut. Life Ins. Co. v. McCue,* 223

---

**17.** The Court is mindful of the jury's providence and the normal hesitancy to disturb jury findings. See e.g., *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (*en banc* opinion regarding standard for determining judgment *n.o.v.*). However, the Court's responsibility for contract construction and determination of ambiguity outweighs the policy for deference in this instance. Had the Court gone with its first instincts and not submitted all the parties' requested issues, fashioning a judgment would be much simpler. The task before the Court is not impossible with the current jury verdict but involves reassessing which answers are within the jury's providence as fact-finder and which are for the Court's determination.

**18.** The Court takes note of the discussion in *Mt. Hawley Co. v. FSLIC,* 695 F.Supp. 469, 481–82 (C.D.Cal.1987), where claims of the FDIC, acting

in its receivership capacity, were found to be excluded under an insured v. insured endorsement. The Court does not reach such a determination today since the language in the endorsement in question differs from that in *Mt. Hawley* and the evidence supports a finding regarding the ambiguous nature of the endorsement.

The Court, however, does not adopt the policy argument in support of ambiguity as discussed in *FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149, 1157 (W.D.La.1986). With this Court's decision regarding the unambiguousness and exclusive nature of Endorsement 1, no necessity exists for adopting or distinguishing further arguments regarding coverage under Endorsement 3. The public policy argument is addressed *infra.*

U.S. 234, 245–46, 32 S.Ct. 220, 221–22, 56 L.Ed. 57, 419 (1911) (criminal conduct); *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 548, 22 S.Ct. 431, 435, 46 L.Ed. 679 (1902) (contravene statutory law).[19]

■ The Court finds that neither Endorsement 1 nor 3 meets such a standard. No statutory insurance minimum exists in the case at bar which the 1983 Policy with its endorsements would violate. Rather directors' and officers' liability insurance is optional under all the rules and regulations promulgated by the various regulatory agencies of the Bank.[20] Thus policies providing limited insurance, which are not required by statute or mandated as to form of coverage, are not invalidated on a public policy argument. *Simons v. City of Columbus*, 593 F.Supp. 876, 880–81 (N.D. Miss.1984), *aff'd*, 805 F.2d 1031 (5th Cir. 1986) (contract exclusions do not violate public policy).

FDIC cites to the Court several unpublished decisions and to *FSLIC v. Oldenburg*, 671 F.Supp. 720 (D.Utah 1987), as authority for its public policy argument. The Court, however, finds all such authority unpersuasive, especially since the only reported case (*Oldenburg*) is based on another case which involved a statutorily required insurance minimum and uses state law not applicable here. See *Farmers Ins. Exch. v. Call*, 712 P.2d 231 (Utah 1985).

The unpublished decisions include federal decisions of the Eastern District of Louisiana and Eastern District of Arkansas and a state court order from a Maryland state court.[21] All of these decisions are tenuously supported and often fail to provide adequate case law for the reasoning. This Court notes that those courts sometimes rely on *Hudspeth*-type theories of deference[22] to FSLIC or FDIC's receivership actions as rationale for refusing to enforce the endorsements. The Court directs the parties to the very recent United States Supreme Court decision of *Coit Independence Joint Venture v. FSLIC as Receiver for FirstSouth, F.A.*, — U.S. —, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989, J. O'Connor), which reverses *Hudspeth*-type arguments and finds that a debtor is entitled to his day in court despite the receivership. Thus much of the "public policy" deference and non-judicial interference with FDIC/FSLIC receiverships has been put to rest.

FDIC argues that to hold the endorsements enforceable gives the parties the right to bargain away FDIC's statutory right to marshal and collect assets. However, the FDIC overlooks the very important fact that in order to marshal and collect an asset, the failed bank must have it

---

**19.** The Supreme Court overruled *Connolly* in *Tigner v. Texas*, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124 (1940), by finding the statutory law constitutional and a time erosion of the considerations used in *Connolly*. The proposition of violating public policy, however, still stands.

**20.** See for example, the Office of the Comptroller of the Currency's regulation codified in 12 C.F.R. § 7.5217 (1989), which governed the failed banking institution in this case. The only requirement in the regulation regarding D & O insurance is a bank's inability to obtain coverage for civil money penalties assessed by the Comptroller against a bank director or employee.

No FDIC-promulgated regulation is found regarding D & O insurance. Only a letter from the FDIC Chairman, not introduced as evidence in this case, indicates the FDIC's urging of banks not to accept insurance with such a FDIC endorsement on it. Such is not sufficient to make the 1983 Policy in violation of law.

**21.** Copies of these courts' orders were attached to FDIC and the defendants' post-trial briefs and

motions and were styled: *FSLIC v. Mmahat*, No. 86–5160, 1988 WL 19304 (E.D.La. March 3, 1988); *American Casualty Co. of Reading, Pa. v. FSLIC*, 704 F.Supp. 898 (E.D.Ark.1989); and *Maryland Deposit Insurance Fund Corp. v. American Casualty Co. of Reading, Pa.*, No. 88095087/CL 79669 (Cir. Ct. Nov. 17, 1988).

An interesting side note is that American Casualty Company of Reading, Pennsylvania is apparently the sister company of the plaintiff in this case.

**22.** The Fifth Circuit's decision in *North Mississippi Savs. & Loan Ass'n v. Hudspeth*, 756 F.2d 1096 (5th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986), held that a claim against FSLIC must first be pursued administratively so that the courts do not interfere with the receivership. This decision and subsequent cases spurned a great deal of "public policy" concern over the receiverships and a great deal of litigation and *certiorari* petitions to the United States Supreme Court.

as an asset. Here, the bank did not own as an asset directors' and officers' liability insurance without an FDIC endorsement. Therefore, such argument fails. Nothing in the endorsement affects FDIC as receiver to have all the rights and claims that the failed banking institution would have had.

 FDIC steps into the shoes of the failed bank and is subject to whatever contracts the bank, under its freedom of contract, entered. *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112 (1931) (private parties' "utmost liberty" to contract). No compelling public policy reason, inducement of criminal conduct or breaking of statutory laws exists for this Court to find the endorsements void on public policy grounds. Therefore, Endorsements 1 and 3 are enforceable as written and interpreted by the Court.

### Discovery Option

 As the Court has held above, the 1983 Policy is not a renewal of the 1980 Policy. When MGIC failed to renew the 1980 Policy, the defendants could elect 12 more months of coverage under its discovery option.[23] The defendants' discovery option is not triggered until the insurance company gives at least 30 days notice of non-renewal or termination to the Bank.[24] The evidence is uncontroverted that neither MGIC nor the plaintiff gave such notice to the Bank or the defendants. Any discussions regarding the new terms of the 1983 Policy with the Bank's insurance agent are not sufficient to meet the insurance company's affirmative duty to give such notice to the Bank.[25]

Thus the defendants' right to exercise the discovery option still exists due to a lack of notice of non-renewal. The defen-

dants did not waive their right to exercise the discovery option, as the plaintiff contends, in that the requisite notice of non-renewal was never given to the defendants. Therefore, the defendants cannot be said to have "voluntarily relinquished a *known* right". *Massachusetts Bonding Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396 (Tex.1967) (definition of waiver); *Swiderski v. Prudential Property & Casualty Ins. Co.*, 672 S.W.2d 264, 268–69 (Tex.App. —Corpus Christi 1984, writ dism'd). The right to exercise the discovery option was not known to the defendants until this Court's memorandum opinion and partial judgment filed this same date. In fact, evidence in the record indicates that even MGIC's in-house legal counsel did not know if it was in fact nonrenewing the 1980 Policy by substituting the different terms on a take-it-or-leave-it basis. Therefore, the defendants did not waive their right to exercise the discovery option even though they accepted a significantly different insurance policy known to us as the 1983 Policy.

Instead, this Court's opinion and partial judgment, filed this same date, shall be construed as giving the defendants the requisite notice and thereby begin the time frame for exercising such discovery option. All other requirements for exercising the discovery option will still apply.

### Assumption of Obligations

The question now becomes who holds responsibility for any liability stemming from the defendants' exercise of the discovery option, assuming the defendants' properly exercise their option. The plaintiff disputes having any responsibility other than under the 1983 Policy. MGIC, which has been in receivership under the

---

**23.** See Discovery option contained in the contractual language cited in n. 8, *supra.* However, only acts committed before October 27, 1983, are covered by any extension under the discovery option.

**24.** See notice requirement contained in the contractual language cited in n. 7, *supra.*

**25.** Paragraph 8 of the 1980 Policy designates the Bank as the party who will give and receive

notices on behalf of all the defendants and the Bank. Nowhere in the 1980 Policy is the provision that notice to the insurance agent is sufficient. Further, the Texas State Board of Insurance provides rules and regulations regarding the cancellation and non-renewal of insurance policies. *See e.g.,* Tex.Ins.Code art. 21.49–2 (Vernon Supp.1989). Written notice, including the reason for non-renewal, is also usually required. *See* art. 21.49–2A.

control of a Wisconsin Insurance Commissioner's appointed liquidator since 1985, was the insurer who issued both the 1980 and 1983 Policies. Only the 1983 Policy contains an endorsement regarding the plaintiff's assumption of liability for the policy.

As previously discussed, the defendants argue that the jury's answer to Question 20 precludes a finding that the plaintiff only limitedly assumed the obligations of MGIC.[26] The defendants supplement their argument with the statement of the plaintiff's counsel during closing arguments that the plaintiff would stipulate that the answer to Question 20 is "Yes." [27]

■ Once again, the assumption of liabilities and obligations by the plaintiff is based on a contract, specifically the Assumption Agreement. Statements of counsel in a closing argument are *not* evidence for the Court or jury's consideration. The plaintiff's counsel did not stipulate through his statements to any further liability than what the documents and agreements between the plaintiff and MGIC state. To hold otherwise contravenes *Humble Oil & Ref. Co. v. Sun Oil Co.*, 191 F.2d 705 (5th Cir.1951), *cert. denied*, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952). The plaintiff has strenuously argued throughout these proceedings that it only assumed the obligations under the 1983 Policy and never retracted this position.

■ Contract construction is a matter of law for the court to decide—not the jury. *Marden v. International Ass'n of Mach.*, 576 F.2d 576, 580 (5th Cir.1978) (disregard stipulation of contract's effect since Court's duty is to construe contracts); *Kelly Assoc., Ltd. v. Aetna Casualty & Sur. Co.*, 681 S.W.2d 593, 596 (Tex.1984). Under the Assumption Agreement, the plaintiff initially assumed all insurance policy obligations and liabilities of existing policies and certain existing claims.[28] Clearly, claims under the 1983 Policy, a policy covered under Exhibit I to the Assumption Agreement, are assumed by the plaintiff pursuant to sub-paragraph 1) of Article I of the agreement. Any claim asserted by the defendants under the discovery option of the 1980 Policy, an expired policy as of the effective date of the Assumption Agreement, also are assumed by the plaintiff pursuant to sub-paragraph 2)(ii) of the same article of the agreement. The Assumption Agreement defines "claims in existence" for purposes of calculating loss and reserve payments by MGIC in such a manner that it expressly includes a claim made under a discovery option occurring *after* the date of the Assumption Agreement.[29]

**26.** See the text of Question 20 as set out in n. 13, *supra*.

**27.** Mr. Yeager's closing argument contained the following statements:
"Question No. 20, Do you find Continental [the plaintiff] assumed all policy obligations of insurance policies in question from MGIC Indemnity Corporation. We believe this answer to that question should be yes."
During the defense's closing, Mr. Yeager interrupted defense argument of Question 20 by stating:
"I am going to object, because we recommend a yes answer to that question."

**28.** Article I Paragraph A of such agreement provides:
The Company [MGIC] agrees to cede, transfer and convey and CNA [the plaintiff] agrees to accept and to pay and discharge One Hundred Per Cent (100%) of the liability of the Company as of the Effective Date of this Agreement [November 1, 1983] on:
1) all those policies and binders of insurance of the type listed in the Schedule of Policies,

to be attached and form a part hereof as Exhibit I, which policies and binders are in full force and effect on the Effective Date stipulated in Article II hereof; all of which policies and binders being specifically identified in a bordereau or in a format to be agreed upon by the parties (hereinafter "Scheduled Policies"); and,
2) on those expired and cancelled policies which (i) have a policyholder claim liability included in the Loss and Loss Adjustment Expense Reserve of the Company on the Effective Date, (ii) where a claim can be reported after the policy expiration date and (iii) where a claim has been submitted to and denied by the Company. * * *

**29.** Article V Paragraph C defines a "Claim in Existence" as follows:
For the purpose of this Agreement, a Claim in Existence as of the Effective Date shall be deemed to be those claims in which a claim or notice of an occurrence which might give rise to a claim is mailed to the Company on or before the Effective Date; provided, however,

However, admitted as part of the defendants' Trial Exhibit 8 is an untitled agreement dated July 1, 1985, which appears to amend and supersede the Assumption Agreement (also part of Exhibit 8). For lack of a better term, the Court refers to this July 1st document as the "Rescission Agreement." This agreement was entered into by the liquidator for MGIC and the plaintiff upon realization that certain provisions and obligations under the Assumption Agreement would be breached due to MGIC being liquidated and no longer able to perform its required accounting, reserve analysis, and transfers to the plaintiff. The Rescission Agreement is adequately supported by consideration and must be construed as affecting and amending the Assumption Agreement.

In the Rescission Agreement, the liquidator and the plaintiff rescind the plaintiff's assumption of "claims in existence" so that such claims are now the responsibility of the liquidator.[30] Therefore, the Court determines that the defendants' dis-

> if a policy subject to the Agreement was cancelled or *nonrenewed prior to the Effective Date, then any claim reported under any discovery extension period in such policy shall be deemed as reported prior to the Effective Date,* notwithstanding that such claim was in fact reported subsequent thereto [emphasis added]. \* \* \*
>
> This subsection clearly places liability on the plaintiff for any claims resulting under discovery provisions arising after November 1, 1983, under non-renewed policies.

30. The first numbered paragraph in the *Rescission Agreement states the following:*
 > The reinsurance by CNA [the plaintiff] of "Claims in Existence as of the Effective Date" within the meaning of Article V.C. of the Agreement [the Assumption Agreement] constituting approximately 1,402 claims under Company [MGIC] policies (referred to as the "Claims") was and is rescinded as of 11:59 p.m., C.D.T., on June 27, 1985 ("Recapture Date"), and CNA shall have no further obligation or liability whatsoever after the Recapture Date with respect to or arising out of the Claims, except as provided herein. \* \* \*

 Thus, the liability for claims relating to discovery options under non-renewed policies reverts back to MGIC's liquidator for handling.

31. The Court's finding is limited to the facial language of the Rescission Agreement as the finding may be subject to change due to indemnity provisions in the Rescission Agreement.

covery option, if properly exercised, appears on the face of the Rescission Agreement to be a claim against the receivership estate of MGIC, but not against the plaintiff.[31]

In all other respects, the jury findings stand as findings of fact. Such findings taken with the ones made herein, and together with the Court's conclusions of law, shall support the partial judgment entered in this matter this same date.

## PARTIAL JUDGMENT

The Court on this date has entered a memorandum opinion regarding the findings of fact and conclusions of law for the *bifurcated* portion of the trial in the above styled and numbered cause which only involved declaratory judgment on the issues of plaintiff's liability to the defendants[1] on certain directors' and officers' liability policies. For the reasons set forth in the memorandum opinion, the Court renders the following judgment:

> The Rescission Agreement provides in paragraph 6 for indemnity of the plaintiff in order for it to handle certain claims existing after December 31, 1985. Whether the defendants' claim would fall into this indemnity provision and thereby be, once again, the responsibility of the plaintiff is unclear.
>
> Since the Court has no evidence before it regarding the workings of the indemnification provisions and since MGIC's liquidator is *not* a party to this action, the Court cannot assess liability for such a discovery option claim against either the plaintiff or MGIC's liquidator, based on such indemnification provisions.

1. The style of this case is carried as initially filed although some changes occurred in the parties over the last two and a half years. Some parties have been dismissed, *i.e.* Lewis Nance. Some parties have a Clerk's Entry of Default already issued against them, *i.e.* Sam Spikes, Johnny Roy Phillips, and Ronnie Thomas. Other parties may have bankruptcy stays or discharges which prohibit this Court's interference, *i.e.* M.E. Bridges, Robert Clark, First Seminole Bankshares, Inc., James Phillips, Frank Ratcliff, Jr., John Sheppard, and Delbert Warren. The estate of Walker Dearing has been substituted due to the death of Mr. Dearing.

 To the extent then that prior dismissals, bankruptcies or substitutions change the parties involved, this judgment is modified to apply to only those parties correctly before this Court.

IT IS ORDERED, ADJUDGED and DE-CREED that no misrepresentations were made by the defendants that would void the 1983 Policy, a policy of insurance defined in the memorandum opinion. This Court, in compliance with its notification to counsel that it was reconsidering the question of ambiguity of both Endorsements 1 and 3, finds that Endorsement 1 is *not* ambiguous and excludes claims by the Federal Deposit Insurance Corporation ("FDIC"). Endorsement 3 *is* ambiguous and does not include the FDIC as an "insured." However, because Endorsement 1 excludes claims by the FDIC, the 1983 Policy affords no coverage to the defendants as against such claims.

Endorsements 1 and 3 to the 1983 Policy are *not* void as against public policy. Further, the exclusions of personal profit and dishonesty are not invoked and the plaintiff has waived all other grounds for denying coverage not stated in its letter dated October 17, 1984.

Further, the 1983 Policy is not a renewal of the 1980 Policy, a certain insurance policy further defined in the memorandum opinion. MGIC Indemnity Corporation, the issuer of the 1980 and 1983 Policies ("MGIC"), did not give the defendants the requisite notice of non-renewal pursuant to the 1980 Policy. Therefore, defendants' right to exercise the discovery option runs ten days from the date of this judgment. The defendants have not waived or voluntarily relinquished their right to invoke an extension of coverage under the discovery option of the 1980 Policy.

Plaintiff is not liable for any fraud or extra-contractual liability of MGIC, which sold certain blocks of insurance business to the plaintiff, including the 1983 Policy in question. Therefore, the defendants are denied any equitable right of rescission or reformation of the 1983 Policy.

Further, the defendants' insurance agent, Moore–Haralson Agency and Carroll Haralson, may have known certain facts which could have triggered coverage under the 1980 or 1983 Policies, but such knowledge is not imputed to either MGIC or the plaintiff and cannot trigger coverage under the 1980 Policy. In these circumstances, the insurance agent was not only acting as an agent for the insureds but also had a conflicting interest in the subject matter of the insurance by being a director covered under the policies. Due to the conflict of interests, the agent had a duty to affirmatively communicate any known facts to the plaintiff or MGIC.

By contractual agreements, the plaintiff only assumed certain obligations of MGIC. After MGIC was placed in a receivership, one certain contractual agreement rescinded the plaintiff's liability for claims under a discovery option of expired policies, such as the one the defendants may make if they exercise their discovery option under the 1980 Policy. However, the defendants' claim may fall within certain indemnification procedures established between MGIC's liquidator and the plaintiff and therefore could be the responsibility again of the plaintiff. Since the liquidator is not a party to this lawsuit and the Court has no evidence before it regarding whether such a discovery claim would be the responsibility of the plaintiff under the indemnification provisions or was part of the rescinded obligations, the Court cannot assess the liability of the plaintiff on any discovery claim asserted by the defendants.

Therefore, the plaintiff's motion for a mistrial and the defendants' and FDIC's motions for judgment *non obstante veredicto* are DENIED. Further, all parties' motions for judgment to the extent not granted herein are DENIED. The Court notes that issues remain in this case which were bifurcated from this trial and judgment. Therefore, the parties are instructed to advise the Court within 30 days hereof of any further discovery and trial preparation time necessary to complete the trial of this matter.