AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Plaintiff–Appellee,

v.

FEDERAL DEPOSIT INSURANCE COR- PORATION in its corporate capacity and as receiver for First State Bank, White Cloud (93–1243); John A. Cris- man, a stockholder of First State Bank, White Cloud (93–1244); Gerald E. Mar- tin (93–1242); George A. Rosenberg; David A. Hepinstall; Donald G. Rudert (93–1241), Defendants–Appellants,

Richard Graves; Joseph Nelson; John W. Shepard, Defendants.

Nos. 93–1241 to 93–1244.

United States Court of Appeals, Sixth Circuit.

Argued March 15, 1994.

Decided Oct. 26, 1994.

Rehearing Denied Dec. 21, 1994 in No. 93–1243.*

Robert H. Gillette, Wheeler, Upham, Bryant & Uhl, Grand Rapids, MI, John R.

---

* Judge Jones concurs in this order but adheres to his original dissenting position on the merits.

Gerstein (briefed), Thomas H. Howlett, Richard A. Simpson (argued), Ross, Dixon & Masback, Washington, DC, for American Cas. Co. of Reading, Pennsylvania.

Eric N. Macey (briefed), Bruce Braverman, Michael A. Weinberg, Novack & Macey, Chicago, IL, Lawrence H. Richmond (argued), Baltimore, MD, Larry C. Willey, Grand Rapids, MI, for F.D.I.C.

Arthur M. Rude, Parmenter & O'Toole, Muskegon, MI, for John A. Crisman.

William S. Farr, Farr & Oosterhouse, Grand Rapids, MI, for Gerald E. Martin.

Richard Graves, pro se.

James R. Saalfeld, Hillary C. Arthur, Dykema, Gossett, Spencer, Goodnow & Trigg, Stephen D. Turner (briefed), Law, Weathers & Richardson, Grand Rapids, MI, for George A. Rosenberg, David A. Hepinstall, Donald G. Rudert.

John W. Shepard, pro se.

Joseph Nelson, pro se.

Before: JONES, BOGGS, and DAUGHTREY, Circuit Judges.

DAUGHTREY, J., delivered the opinion of the court, in which BOGGS, J., joined. JONES J. (pp. 642–43), delivered a separate opinion concurring in part and dissenting in part.

## DAUGHTREY, Circuit Judge.

In this case, we are asked to determine the scope of coverage of an officers and directors ("D & O") liability insurance policy, issued in 1987 by the plaintiff, American Casualty Company of Reading, Pennsylvania. The legal dispute involved here has been litigated in many courts around the country, in the wake of numerous bank and savings and loan failures in the past decade.[1]

The defendants, the Federal Deposit Insurance Corporation and the individual directors of a failed Michigan bank, appeal the district court's order of summary judgment in the plaintiff's favor. In so ruling, the court determined that American Casualty is not liable for claims made under the D & O liability policy in question. The central issue is whether the "regulatory exclusion" endorsement in the policy bars coverage in this case, which requires us to determine whether the endorsement was a valid part of a "renewal policy" issued by American Casualty, under applicable Michigan law. The defendants also contend that such an endorsement violates public policy and should not, therefore, be enforced, and that even if valid, the "regulatory exclusion" is at least partially inapplicable in this case on a purely technical basis.

We conclude that the district court correctly granted summary judgment in the plaintiff's favor and affirm.

### I. *Procedural History*

In 1984, the First State Bank of White Cloud, Michigan, obtained D & O liability insurance through the Rudert Insurance Agency of White Cloud. The Rudert Agency was owned by Donald Rudert, a shareholder and a director of the First State Bank; Rudert's wife, Norma; and the couple's son, Eric, who served as vice-president of the agency and was also a shareholder in First State Bank. In fact, Eric Rudert had handled the procurement of at least six lines of the bank's insurance and was responsible for the day-to-day insurance dealings with First State Bank.

Pursuant to the terms of the 1984 policy written by MGIC Indemnity Corporation and obtained through the Rudert Agency, First State Bank paid $6969 in premiums for *three* years of liability insurance coverage. For those premiums, the MGIC Indemnity policy provided an annual aggregate limit on coverage of $2 million, subject to a $5000 deductible for each loss. In addition, the policy

---

1. *See, e.g., American Casualty Co. v. Baker,* 22 F.3d 880 (9th Cir.1994), *American Casualty Co. v. Continisio,* 17 F.3d 62 (3d Cir.1994); *American Casualty Co. v. FDIC,* 16 F.3d 152 (7th Cir.1994); *Adams v. Greenwood,* 10 F.3d 568 (8th Cir.1993); *FDIC v. American Casualty Co.,* 998 F.2d 404 (7th Cir.1993); *FDIC v. American Casualty Co.,* 995 F.2d 471 (4th Cir.1993); *FDIC v. American Casualty Co.,* 975 F.2d 677 (10th Cir.1992); *Fidelity & Deposit Co. v. Conner,* 973 F.2d 1236 (5th Cir.1992); *St. Paul Fire & Marine Ins. v. FDIC,* 968 F.2d 695 (8th Cir.1992); *American*

contained nine endorsements, including one that extended coverage to all bank employees, not just the bank's officers and directors, and another that provided a 90-day "discovery option" allowing the bank, in the event of cancellation or non-renewal of the policy, to purchase an additional 90 days of coverage for any claims made during that time.

Prior to the March 15, 1987, expiration of the 1984 policy, First State Bank contacted the Rudert Agency about renewing the D & O coverage. Because of deteriorating market conditions, however, the Rudert Agency was unable to obtain a quotation on the same terms as the 1984 policy. The quotation received by Eric Rudert from American Casualty proposed to offer one year of coverage through CNA Insurance Company (which had taken over the MGIC Indemnity policies), rather than the three-year policy previously obtained through MGIC Indemnity. Furthermore, the premiums due on the new policy would rise from the $6969 paid in 1984 for three years of coverage to $12,000 for only one year of coverage, and the aggregate annual liability limit would be reduced from $2 million to $1 million. Additional terms of the 1987 quotation included a restriction on coverage to officers and directors of the bank only, rather than all employees, and the "regulatory exclusion" that is at the center of this controversy. Pursuant to the terms of that endorsement, the insurer would not be liable for any payment for a loss or claim by a director or officer of the bank based upon ... any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation, the Federal Savings & Loan Insurance Corporation, any other depository insurance organization, the Comptroller of the Currency, the Federal Home Loan Bank Board, or any other national or state regulatory agency (all of said organizations and agencies hereinafter referred to as

"Agencies"), including any type of legal action which such Agencies have the legal right to bring as receiver, conservator, liquidator or otherwise: whether such action or proceeding is brought in the name of such Agencies or by or on behalf of such Agencies in the name of any other entity or solely in the name of any Third Party.

In its acceptance of the quotation from the insurer, moreover, First State Bank was required to acknowledge that its acceptance waived any rights the bank may have had under the discovery clause of the 1984 policy.

On March 12, 1987, Gerald E. Martin, on behalf of First State Bank, signed the quotation from American Casualty, accepting its offer of coverage and waiving invocation of the discovery option. In February of 1988, First State Bank failed and the FDIC was appointed receiver of the bank. The receiver then transferred various assets of First State Bank to the FDIC in that agency's corporate capacity. In accordance with the provisions of a merger endorsement to the D & O policy, the failure of the bank effectively cancelled the insurance coverage provided by American Casualty as of the date of the failure. At that time, however, no claims for coverage under the policy had been made by any director or officer of First State Bank.

In March 1990, John A. Crisman, a shareholder of First State Bank, requested, in order to fulfill the requirements of Michigan Court Rule 3.502(A)[2] and M.C.L.A. § 450.1493a,[3] that the FDIC, as receiver, institute "a suit against the officers and directors of that bank to recover damages for malfeasance in office, negligence, fraud, and dereliction of duty." When the FDIC refused to file such a suit, Crisman filed his own complaint in state court. In that complaint, Crisman named Gerald Martin, Richard Graves, George Rosenberg, David Hepinstall, Donald Rudert, Joseph Nelson, and

*Casualty Co. v. FDIC,* 944 F.2d 455 (8th Cir. 1991).

**2.** Michigan Court Rule 3.502(A) provides:

In an action brought by one or more shareholders in an incorporated or unincorporated association because the association has refused or failed to enforce rights which may properly be asserted by it, the complaint shall set forth under oath and with particularity the efforts of

the plaintiff to secure from the managing directors or trustees the action the plaintiff desires and the reasons for the failure to obtain such action, or the reasons for not making such an effort.

**3.** In pertinent part, M.C.L.A. § 450.1493a provides that "[a] shareholder may not commence a derivative proceeding until ... [a] written demand has been made upon the corporation to take suitable action."

John Shepherd, all officers or directors of First State Bank, as defendants. Crisman's complaint also explicitly stated that the action was being brought *"on behalf of* the First State Bank, White Cloud and its receiver, *the Federal Deposit Insurance Corporation ....* " (Emphasis added.)

Eventually, the FDIC intervened in the *Crisman* lawsuit and removed the action to federal court. In March 1991, the FDIC filed its own complaint against Martin and Graves, but not against the other defendants named by Crisman. In response to the two suits, the officers and directors of First State Bank demanded coverage from American Casualty under the bank's 1987 D & O policy. The insurance company then filed its own complaint in this case, seeking a declaratory judgment that the "regulatory exclusion" in the 1987 policy barred coverage of the named defendants in the *Crisman* and *FDIC* suits.

After a period of discovery, American Casualty moved for summary judgment. On November 22, 1991, defendants Rosenberg, Hepinstall, and Rudert also filed a motion for summary judgment, arguing that the "regulatory exclusion" in the 1987 policy could not be applied to bar coverage of their claims because the *FDIC* lawsuit did not name those three individuals as defendants. By opinions and orders dated January 8, 1993, the district court granted American Casualty's motion for summary judgment and denied the summary judgment motion filed by Rosenberg, Hepinstall, and Rudert.

## II. *Applicability of the "Regulatory Exclusion" Endorsement*

In granting the plaintiff's motion for summary judgment, the district court determined that the *Crisman* suit was brought "on behalf of" the FDIC and that, consequently, the "regulatory exclusion" contained in the 1987 D & O insurance policy barred coverage of the directors. The individual defendants allege that the suit was not, in fact, brought on behalf of a regulatory agency and that the exclusion should not apply in this instance. Furthermore, the individual defendants suggest that the "regulatory exclusion" itself is contrary to public policy and should not be enforced.

### A. *"By Or On Behalf Of" The FDIC*

■ Defendants Rosenberg, Hepinstall, and Rudert initially point out that the FDIC itself did not bring suit against them for improper banking practices and argue that the "regulatory exclusion" endorsement is inapplicable to them. While it is true that the FDIC's complaint in these proceedings named only Gerald Martin and Richard Graves as defendants, it is also true that the shareholders' derivative suit brought by Crisman against Rosenberg, Hepinstall, and Rudert was explicitly brought "on behalf of" the FDIC. The individual defendants submit, nevertheless, that the mere wording of a plaintiff's complaint cannot transform an action into one barring insurance coverage pursuant to a "regulatory exclusion." Moreover, the individual defendants argue that the FDIC was given the opportunity, under Michigan law, to bring the suit that Crisman requested and chose not to do so.

The *facts* surrounding American Casualty's claim that the *Crisman* suit was brought "on behalf of" the FDIC are not in dispute in this matter. Thus, the trial court properly reviewed this issue under the summary judgment principles of Fed.R.Civ.P. 56. This court reviews the grant of a motion for summary judgment *de novo. Jones v. Tennessee Valley Auth.,* 948 F.2d 258, 261 (6th Cir. 1991). Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Applicable law supports the district court's conclusion that the "regulatory exclusion" of the 1987 policy does bar coverage of the individual defendants under the facts of this case. Despite the individual defendants' attempt to recharacterize Crisman's complaint, Crisman did attempt to bring a shareholder's derivative action against the officers and di-

rectors of the bank "on behalf of ... the Federal Deposit Insurance Corporation." Moreover, under established principles of corporate law, a shareholder's derivative action cannot be brought except on behalf of the corporation itself, or on behalf of another entity, such as the FDIC, that has succeeded to the corporation's derivative rights. *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir.), *vacated in part on other grounds on reh'g*, 828 F.2d 1145 (6th Cir.1987), *modified in other respects*, 933 F.2d 400 (6th Cir.1991).

Furthermore, the fact that the FDIC did not itself bring an action against Rosenberg, Hepinstall, and Rudert does not necessarily foreclose application of the terms of the "regulatory exclusion." Pursuant to the unambiguous terms of the exclusion itself, the policy provision included "any type of legal action which such Agencies *have the legal right to bring* as receiver, conservator, liquidator or otherwise." Because the FDIC, as the receiver of First State Bank, had the legal right to bring an action against the individual defendants for their actions allegedly resulting in the diminution in the value of the bank's stock, the action by Crisman fell under the provisions of the "regulatory exclusion" on this basis as well.

In an effort to secure coverage under the bank's D & O policy, the individual defendants claim that the decision in this matter should follow the reasoning of the district court in *American Casualty Co. v. FSLIC*, 683 F.Supp. 1183 (S.D.Ohio 1988), and they advance the same arguments made by the FDIC in *FDIC v. Zaborac*, 773 F.Supp. 137 (C.D.Ill.1991), *aff'd in FDIC v. American Casualty Co.*, 998 F.2d 404 (7th Cir.1993). As noted by the district court in this case, however, both of those cases involved substantively different situations. In those cases, the courts wrestled with the issue of whether the action under consideration was brought "by" the federal regulatory agency. Furthermore, in each case, the original complaint was filed *prior* to the receivership of the FDIC or the FSLIC. Consequently, even though the court in *Zaborac* ultimately held that the "regulatory exclusion" was applicable to the situation presented to it, 773 F.Supp. at 140–41, both *American Casualty*

*Co. v. FSLIC* and *FDIC v. Zaborac* are readily distinguishable from this case.

The individual defendants also argue that a decision upholding a denial of coverage in this case would necessarily prevent coverage of directors and officers under "regulatory exclusions" in *all* shareholder derivative actions. Such an assertion is, however, far too broad. Only those shareholder derivative actions brought in situations in which a regulatory agency has succeeded to a corporation's cause of action are affected by the "regulatory exclusion." In situations in which a bank has not failed, for instance, a shareholder's derivative action would be brought on behalf of the corporation itself, and a regulatory agency would not "have the legal right to bring" such an action. Thus, the shareholder's suit would not trigger the provisions of a "regulatory exclusion." *See e.g., American Casualty Co. v. FSLIC* and *FDIC v. Zaborac, supra.*

Finally, if Crisman had not brought his shareholder's derivative suit "on behalf of" the FDIC, he could not have brought the action at all. The corporation allegedly injured by the actions of the individual defendants no longer possessed the legal right to bring such an action; all such rights had been effectively transferred to the FDIC as receiver for the failed bank. In fact, even the individual defendants recognize in their brief that 12 U.S.C. § 1821(d)(2)(a)(i) (1989) provides:

> The [FDIC] shall, as conservator or receiver, and by operation of law, succeed to ... all rights, title, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution....

Thus, from a purely practical standpoint, any shareholder's derivative action brought by Crisman must have been brought on behalf of the successor to the corporation's legal right to bring such an action—the FDIC.

### B. *Public Policy Considerations*

Defendants Rosenberg, Hepinstall, and Rudert also submit that a "regulatory exclusion" like the one involved in this case con-

travenes public policy because such a provision misrepresents to a large segment of society the effectiveness of purchased liability insurance and because the exclusion serves to minimize the funds available to compensate depositors and investors.

A question of contract interpretation, including whether a "regulatory exclusion" violates public policy, is a question of law which this court reviews *de novo. FDIC v. Aetna Casualty & Surety Co.,* 903 F.2d 1073, 1077 (6th Cir.1990). Generally, "competent persons shall have the utmost liberty of contracting and ... their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City Pipe Line v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 477, 75 L.Ed. 1112 (1931); *Fidelity & Deposit Co. v. Conner,* 973 F.2d 1236, 1241 (5th Cir.1992). Thus, a court's refusal to enforce a contract on public policy grounds is limited to situations in which the contract violates "some explicit public policy." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). Moreover, that public policy must be "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id., quoting W.R. Grace and Co. v. International Union of United Rubber, Cork, Linoleum and Plastic Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945).

Although a question of first impression in this circuit, the issue of whether a "regulatory exclusion" violates public policy has been addressed recently in several other circuits. In each instance, the appeals courts have concluded that the "regulatory exclusion" does not violate any public policy explicitly defined in applicable statutes. *See, e.g., FDIC v. American Casualty Co.,* 995 F.2d 471, 473–74 (4th Cir.1993); *Fidelity & Deposit Co. v. Conner,* 973 F.2d 1236, 1243–44 (5th Cir.1992); *St. Paul Fire and Marine Ins. Co. v. FDIC,* 968 F.2d 695, 702–03 (8th Cir.1992); *FDIC v. American Casualty Co.,* 975 F.2d 677, 682 (10th Cir.1992). The decisions in these cases have examined the provisions and legislative history of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. §§ 1811–1833, and have concluded that "FIRREA does not establish an explicit public policy that would invalidate the regulatory exclusion." *St. Paul Fire and Marine Ins. Co. v. FDIC,* 968 F.2d at 702.

In fact, the legislative history of FIRREA indicates that the FDIC initially suggested statutory language that would have allowed that agency to avoid any "regulatory exclusion" in a D & O liability policy. Congress rejected that proposal, however, and explicitly provided in the legislation:

The conservator or receiver may enforce any contract, *other than a director's or officer's liability insurance contract* or a depository institution bond, entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, solvency or the appointment of a conservator or receiver.

12 U.S.C. § 1821(e)(12)(A) (emphasis added). Thus, as noted by the Fifth Circuit in *Fidelity & Deposit Co. v. Conner,* 973 F.2d at 1243, FIRREA cannot be relied upon to create or define a public policy against enforcement of a "regulatory exclusion."

Other circuits have also addressed the specific challenges to the "regulatory exclusion" raised by the individual defendants in this case. In *St. Paul Fire and Marine Ins. Co. v. FDIC,* 968 F.2d at 702–03, for example, the Eighth Circuit rejected arguments that the regulatory exclusion "frustrates the 'reasonable expectations' of the insured about the scope of coverage" and that it "is in effect a 'hidden major exclusion' which must be strictly construed against the insurer and in favor of coverage." In upholding the validity of the "regulatory exclusion" against such a contention, the court concluded:

In the present case, the regulatory exclusion was not hidden in the policy. As discussed above, the terms of the regulatory exclusion were plain and unambiguous. Moreover, as noted by the district court, this is not a case which involves disparity

in bargaining power; the insured parties were a bank and its senior management, one of whom was a licensed insurance agent.

*Id.* Similarly, in the present case, the regulatory exclusion was not "hidden" in the policy, but was prominently displayed on a separate page of the quotation as a "Limitation Of Coverage." Also, the insureds were officers and directors of a bank, and one of the named defendants, Donald Rudert, was even a co-owner of the insurance agency that secured the D & O policy for First State Bank.

The individual defendants' second argument that the "regulatory exclusion" violates public policy—the assertion that enforcement of the exclusion would diminish the funds available to investors and depositors—has also been rejected by another circuit court. In addressing a similar contention, the Tenth Circuit determined simply that Congress did *not* choose to provide a clear statement of policy regarding the validity of "regulatory exclusions." *FDIC v. American Casualty Co.*, 975 F.2d at 682. In fact, the court noted that relevant legislative history explicitly states that the intent of Congress is to "remain neutral on these matters." *Id., quoting* 135 Cong.Rec. S10182, S10198 (101st Cong., 1st Sess. August 4, 1989).

Because no well-defined and dominant public policy against enforcement of "regulatory exclusions" has been articulated by Congress in FIRREA or in other relevant legislation, we decline to formulate such a policy by judicial edict. Furthermore, we note that by including a "regulatory exclusion" in its D & O policy, American Casualty is simply offering lesser insurance coverage, presumably at a lower price. Had the director defendants insisted upon insurance coverage without the "regulatory exclusion," they surely would have expected to pay more for such coverage. Recognition of a public policy against D & O liability insurance containing a "regulatory exclusion" would, in effect, either require a particular, high-quality form of D & O insurance, or else require insurers to furnish a level of insurance coverage for which they will not be paid. Neither result is supportable public policy.

### III. *Validity of the "Regulatory Exclusion"*

Recognizing the weight of case law upholding the theoretical validity of "regulatory exclusions" in D & O liability policies, the FDIC seeks to invalidate such a provision in this case by arguing that the 1987 policy containing the "regulatory exclusion" was invalid to the extent that it provided for reductions in coverage that were not specifically brought to the insured's attention at the time of renewals, and that under well-settled Michigan law, the earlier provisions providing greater protection remained in effect. The defendants also claim that American Casualty's March 1987 quotation of significantly different terms constituted a refusal to renew, which in turn should have triggered the discovery option in the 1984 policy and allowed the directors and officers of First State Bank to seek coverage for any liability in the *Crisman* lawsuit.

### A. *Notification of Reduced Coverage*

■ Under general principles of Michigan insurance law, "[a]n insured is obligated to read the insurance policy and raise questions concerning coverage within a reasonable time after the issuance of the policy." *Parmet Homes, Inc. v. Republic Ins. Co.*, 111 Mich. App. 140, 145, 314 N.W.2d 453, 455 (1981). That rule does not apply, however, "when a renewal policy is issued without calling the insured's attention to a reduction in coverage, as the insurer in those circumstances is bound by the greater coverage in the earlier policy." *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1494 (6th Cir.1991). *See also Industro Motive Corp. v. Morris Agency, Inc.*, 76 Mich.App. 390, 396, 256 N.W.2d 607, 610 (1977). The relevant questions in this appeal by the FDIC thus become whether the bank received notice of relevant changes in policy provisions and, if so, whether that notice was sufficient under applicable Michigan law to permit the insurance company to avoid liability.

The FDIC contends that there is a genuine issue of material fact in this case as to whether the bank officials were properly informed that the renewal policy would contain differ-

ing terms from the policy that had been in force between 1984 and 1987. American Casualty submits, however, that it is undisputed that the appropriate bank officials were informed of the policy changes proposed in the 1987 quotation.

The parties do not contest the fact that Eric Rudert represented the Rudert Agency in that entity's dealings with First State Bank. It is also undisputed that Rudert routinely discussed the bank's insurance business with Gerald Martin, the president and CEO of First State Bank. Unfortunately, Martin was involved in a serious automobile accident in November 1987 and has no recollection of any discussions of events surrounding the March 1987 renewal of the bank's D & O policy. Consequently, the only testimony regarding the notice transmitted to the bank regarding proposed changes in the renewal policy was provided by Eric Rudert during two depositions given by him in 1991.

During the first such discovery proceeding on May 31, 1991, Rudert repeatedly testified, in response to questions from the FDIC's counsel, that he could not recall the specific content of discussions he had with Martin regarding the renewal policy. However, Rudert did remember discussing the drastic increase in premium prices due to "hardening" of market conditions, and he further testified, "We didn't sit down and read the whole policy, but we went through the major portions of the policy, which would have been those endorsements shown." Although Rudert could not recall exactly *when* he had discussed the 1987 endorsements with Martin, he testified, "I can say for most of them,

to the best of my knowledge and belief, yes, I have talked to him about these endorsements on these policies."

During his November 21, 1991, deposition, Rudert attempted to clarify his earlier May testimony. He stated unequivocally in the second deposition that he and Martin "looked at the text of each policy exclusion at some point" prior to acceptance of the renewal quote. Rudert also claimed that Martin was given an opportunity to ask questions about the new policy endorsements at that time, but said he could not recall specifically whether any questions were actually propounded. Rudert described Martin at this point as being "bullish on the bank," meaning, as he explained it, that Martin seemed "unconcerned about negative aspects, exclusions to the policies ... [and] he said that we don't have to worry about these things." Asked specifically if he and Martin had discussed the "regulatory exclusion" endorsement, Rudert replied, "I do have to believe that I talked to him about it, because when we mentioned the FDIC, ... he said this is something we don't have to worry about."

Finally, Rudert testified that, to the best of his knowledge, he reviewed all the new endorsements with Martin "prior to the issuance of the 1987 policy, prior to the acceptance of this quotation by Mr. Martin." Any hesitancy or uncertainty on Rudert's part during the depositions was, he testified, the result of his inability to pinpoint exact time frames, rather than doubt as to whether conversations regarding the new endorsements actually took place.[4]

---

**4.** The dissent suggests that Eric Rudert's testimony in his two depositions is "mutually inconsistent," and that the alleged "difference between the two depositions is material to the case." To support this allegation of inconsistency, the dissent makes references to the record that indicate that Rudert, at his first deposition, either "could not recall" or "could not 'swear'" to certain discussions concerning changes contained in the renewal policy. Importantly, however, Rudert's lack of recall at the time of the first deposition cannot be equated with a position that Rudert and Martin did not even discuss the proposed policy alterations. In fact, while questioning Rudert about his lack of recall regarding discussions with Martin about the "regulatory exclusion," an attorney representing the FDIC engaged the deponent in the following colloquy:

Q: Just so that record is clear, when you say no, you mean you have no specific recollection of if he said that or when he said that or about what particular endorsement he said it about; is that correct?
A: No. I can't pinpoint a time that he said what about this, and I can't pinpoint anything.

By the time of his second deposition, Rudert still could not "recall" specific time sequences or dates involved in the policy renewal discussions. He was able to state, however, that he knew for a fact that he and Martin "looked at the text of each policy exclusion at some point ... together."

The transcripts of Rudert's two depositions are uncharacteristically clear that there is no "material difference" or inherent inconsistency between the statements made concerning the provi-

The FDIC was unable to offer any evidence to rebut Rudert's testimony that Martin was given notice of the changes in the 1987 renewal quotation. The FDIC, therefore, argues that the notice given to the bank was legally insufficient. In support of its claim, the FDIC cites *Gristock v. Royal Ins. Co.*, 87 Mich. 428, 49 N.W. 634 (1891), and contends that specific reference to each change in the policy is required under Michigan insurance law. The FDIC also cites cases from other jurisdictions requiring more specific, or even explicit written, notification of changes made in renewal policies.

Regardless of the standard imposed in other jurisdictions, the applicable law in Michigan requires only that there be "actual notice to the insured that the policy has been altered," *Parmet Homes, Inc. v. Republic Ins. Co.*, 111 Mich.App. at 145, 314 N.W.2d at 455, or that the insurer call "to the insured's attention a reduction in policy coverage." *Industro Motive Corp. v. Morris Agency, Inc.*, 76 Mich.App. at 396, 256 N.W.2d at 610; *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d at 1494. In this context, the FDIC would have us apply *Gristock* more broadly than a careful reading would allow. The *Gristock* case involved changes in the written terms of an initial insurance policy following oral assurances of coverage, not changes in a successive policy. The Michigan Supreme Court's requirement that, under such circumstances, an insurer must call attention to those clauses which differed from the oral application is not fundamentally different from the requirement noted in later cases such as *Parmet Homes, Industro Motive*, and *J.C. Wyckoff & Assocs.* involving renewal policies. Nevertheless, the two situations are clearly distinguishable.

In any event, there is no *genuine* dispute in this case that Eric Rudert had given actual notice of the changes in the D & O policy to Gerald Martin *prior to* the acceptance of the renewal quote; the only dispute was the exact date that such notice was given. Consequently, no genuine issue concerning a material fact was before the district court. Summary judgment in favor of American Casualty was, therefore, proper. As noted in the district court's opinion on this issue, any factual issues regarding the extent to which Rudert and Martin discussed the renewal quotation are immaterial. The district judge concluded, "It is clear that actual notice was given to Martin that the renewal policy had been altered. The minor factual differences do not raise any triable issue of fact." The record fully supports this conclusion.

## B. *Renewal or Refusal?*

■ One further contention by the FDIC deserves mention but not detailed explication. The FDIC argues that American Casualty's failure to offer a policy on the very same terms as were contained in the 1984 policy amounted to a "refusal to renew" the policy that should have allowed First State Bank to exercise the discovery option in the 1984 policy and thus extend the coverage offered by that earlier contract. The FDIC also insists that the "refusal to renew" was part of a nationwide scheme by American Casualty to defraud insureds. The district court appropriately determined that there was no merit to either of these contentions.

In the first place, the record establishes without dispute that First State Bank voluntarily *agreed* to the terms of the renewal policy and *expressly waived its rights under the discovery option clause of the 1984 contract*. Moreover, the extended period available under the 1984 discovery option had expired by the time the claims in this case were made. Finally, and most significantly, the bank and its officers and directors were experienced participants in business affairs, who were given adequate notice of the changes in premium and coverage under the new policy. The FDIC has thus failed to provide any evidence that the officers and directors were placed in an unfair position or were misled into accepting unconscionable policy terms. On the contrary, the evidence

---

sion of notice to First State Bank. Rather, any differences in the depositions only highlight the fact that Rudert was able to refresh his memory adequately between the times of the two discovery proceedings. The fact that a deponent is later able to recollect information he formerly could not remember does not create a genuine issue of material fact that renders summary judgment inappropriate.

before the district court indicated that the change in terms in the 1987 renewal policy was dictated by "hard" market conditions in a banking industry that was afflicted with numerous cases of mismanagement at that time. As another circuit court has noted when faced with virtually the identical contention made here, involving some of the same players as in this case:

> It is true that American Casualty increased its premium and decreased its coverage for the officers and directors when it discovered the state of the Bank's loan portfolio. That strikes us, however, as a reasonable business decision rather than bad faith. The parties are sophisticated business people who dealt at arm's length. This transaction could have ended in several different ways. But the fact remains that the parties agreed to the terms of the 1984 [renewal] policy. We will not discard their agreement and remake their business relationship.

*American Casualty Co. v. FDIC*, 944 F.2d 455, 459 (8th Cir.1991).

For the reasons set out above, we AFFIRM the district court's order of summary judgment in favor of the plaintiff.

NATHANIEL R. JONES, Circuit Judge, concurring in part, and dissenting in part.

I concur in sections I and II of the majority opinion, but I respectfully dissent from the majority's characterization of the record evidence that is the basis of section III. As the majority correctly states, the question in Section III is whether Rudert called the changes in the policy to the attention of Martin. Majority Op. at 639. The majority acknowledges that, in his deposition testimony of May 31, 1991, Rudert testified "that he could not recall the specific content of discussions he had with Martin regarding the renewal policy." *Id.* at 640. Yet, it attributes Rudert's uncertainty to a mere "inability to pinpoint exact time frames." *Id.* at 640; *see also id.* at 641 ("the only dispute was the exact date that such notice was given."). However, a review of the record makes it clear that Rudert's uncertainty extended far beyond mere confusion about dates and times.

In his first deposition, Rudert testified that he recalled discussing the quotation with Martin and pointing out that the price had gone up. J.A. at 607, 608. He further testified that he could not recall whether he had the specimen endorsements with him on the one occasion on which he met with Martin to discuss the renewal policy, *id.* at 608, 610, that he could not recall reading the endorsements with Martin, *id.* at 608, that he could not "swear" that he discussed the endorsements with Martin, *id.* at 609, and, most importantly, that he did not recall telling Martin that the quotation contained any different endorsements than in the previous policy. *Id.* at 614–15; *see also id.* at 622 ("I can't specifically say that we talked about [the differences between the previous and the new policies] or not."). Yet, at Rudert's second deposition, he testified that he and Martin definitely looked at each policy exclusion at some point.

In short, it seems clear that Rudert's two depositions are mutually inconsistent. I believe that the difference between the two depositions is material to the case. By giving credence to Rudert's later deposition and rejecting his earlier one, the majority engages in a weighing of the evidence that is improper at this stage of the litigation. The majority makes inferences in favor of American Casualty Company, whereas it is obliged, in this summary judgment posture, to make all reasonable inferences in favor of FDIC. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1041–42 (6th Cir.1992) ("[I]n a motion for summary judgment, 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

For these reasons, although I join the majority in affirming that Crisman's shareholder derivative suit was brought on behalf of FDIC, and that the regulatory exclusion is not contrary to public policy, I believe that genuine disputes of material fact remain, and so I would reverse the lower court's grant of

summary judgment in part and remand for further proceedings.